Good morning, Your Honor. So may it please the Court, Deputy Attorney General Seth McCutcheon on behalf of the state. I am prepared to discuss the entire argument, all of the claims, after discussing the PFR. I think the PFR set forth our position, and that is this Court, along with the District Court, erred by not reviewing the record de novo after finding 2254D satisfied. It's our position that a review of the record, a de novo review, would have seriously undermined petitioner's claims, especially as to the performance prong. How would it have changed the prejudice prong? It would not have. The record would have been the same. All right. Go right ahead. Should I go on and talk about the PFR or move on? Is that the entirety of your argument regarding the PFR? Well, I'm happy to go into what the evidence in a de novo review would have shown. As for performance, if we are looking at all three claims, actually, in the evidentiary hearing, what came out undermined all three avenues in the sense that... And so, which was the evidentiary hearing in front of the District Court? That's correct. But the District Court explicitly said he was not considering any of that evidence, because he shouldn't have had the evidentiary hearing to begin with. Well, the evidentiary hearing was not to be considered during the D analysis. However, once the Court had concluded that D had been satisfied, it was then presented at the evidentiary hearing and reviewed the record de novo. He said he was not considering it, the evidence before him. He was considering the evidence attached to the petition and the evidence before the State Court. And that's why the Court erred. The Court properly considered the State analysis, but failed to consider what had been presented at the evidentiary hearing when it was required to conduct de novo review after finding D satisfied. So he had the evidentiary hearing prior to Pinholster, right? Correct. He had the four-day evidentiary hearing, then Pinholster came out. I agree with Judge Wardlaw. He's got a very clear record saying, I'm not going to consider that evidence. And I think you're... I actually found your argument on this a little convoluted. Maybe I'm not the But I... but I... just so you have a chance to clarify. I think your point... one point you make clearly is that he's argued that his counsel was ineffective in the State Court. Other evidence should have been brought in, especially in the penalty phase. And that, I think, your point is we don't have to guess about what that would have been because he had an evidentiary hearing in Federal District Court. Yes? That's correct. Okay. And so you're arguing today that had there... had the... had the court gotten to the point in... when the court got to the point in its analysis where D was satisfied, 2254 D was satisfied, there should have been a de novo review and that would have changed... and it would have changed the penalty phase or the... I guess you're saying both... both prongs of Strickland? That's correct. Okay. Please... please explain to us how and why that would have changed. Certainly. So in the declaration that counsel submitted, he stated that he didn't pursue any mitigation defense beyond what was presented at the guilt phase. However, at the evidentiary hearing, his testimony... Federal evidentiary hearing. Correct. At the Federal evidentiary hearing, his testimony belied that statement. He stated that he made several unsuccessful phone calls to the uncle. Because... because that statement contradicts that... that... because the statement at the Federal evidentiary hearing contradicts what he stated in his declaration, that statement in the declaration should be discounted in its entirety. Counsel, I'm still not following because the district court said it... it... it should not have held that evidentiary hearing and it was not considering any of that evidence. And that's true, but the fact remains that the court did hold an evidentiary hearing. Testimony had been presented. The only thing that hadn't been done is the court making findings or rulings as to what was presented. I think we're a little bit in Alice in the Looking Glass. I mean, this is kind of going down the rabbit hole that it... it... because it doesn't make sense legally, you know, to go through the legal framework here. And maybe... maybe part of the confusion I think that we're all having is it... it's a kind of unusual... usually it's the other way around. Usually it's the petitioner who wants the extra evidence considered, right? And... and here it's the state that's... I mean, it's an unusual posture, is it not? It is an unusual posture. I would say that frequently we see claims suffer after an evidentiary hearing. That's exactly what occurs here. But why would it be fair for us to peek at that? It's... I mean, Pinholtzer is really clear and... and Shin versus Romare is even clearer, right? We're really bound by the state court record. Well, we're bound by the state court record, but only so far as the question as to whether D is satisfied. So your point is now... now if D is satisfied, which you dispute, but if D is satisfied, then you think it's all fair game. Exactly. And... right? And I... that's what I'm understanding your argument to be. And you want us to look at that and what we would see there, you think, is the discrepancy with defense counsel's statement about whether he did or did not count... contact relatives. Yes. Okay. I understand that point. What's your next point? Well, based on that discrepancy and... and based on the... the... the notion that now that declaration should be discounted, then the declaration is silent as to any... any decision making that counsel made as to any of the avenues of mitigation. Well, except we do have his statement at the trial level to the trial court that he was... he was not introducing any further mitigation evidence other than what he had previously introduced, which was minimal at best in the guilt phase. And that's true. However, that statement's unrelated to whether he conducted any investigation or his decision making behind why he was proceeding the way he did. Let me ask you a related question. During the guilt phase, you know, there's a place in the transcript where he's having a conversation with the superior court judge, and it's very clear that he said, I'm relying on the evidence produced in the guilt phase, that... that there was mitigation in the... in the guilt phase, and I'm going to rely on that for the penalty phase. I'm not going to introduce any more. Is there any... that's my paraphrase, of course, but I think that is accurate. Yes. And so is that... was there any mitigation evidence offered during the guilt phase that didn't come in through the defendant? Yes. Well, the... the article is steaming through the fog. Whether we say it came in through the defendant or not... Well, it certainly relied on the defendant's veracity. Yes. He authored it. Yes. Is there anything else? It was bolstered by evidence presented by Ava, the victim's husband. There was evidence that... What was it? What's the sentence? Sorry. The article. The statements in the article, as well as some of his testimony regarding the treatment that he experienced in the Soviet Army. The victim's husband's testimony, I think, was pretty vague on this point, but he did say that he... he understood. It was his understanding that Estonians were treated very poorly in the Russian military. Did he say more than that? Well, he... he explained that when Wade Lush showed up, he was haggard, he was malnourished, and it... it not only bolstered the... the account that... that Wade Lush put forth in this article, but it also kind of undercuts this idea that the jury would have discounted this article as... as coming from a liar such as Wade Lush. Not to mention the fact that the article was written with the assistance of the victim. On prong one of Strickland, you just hit on what I think is your toughest problem for prong one, and that is that by the time the case rolled around to the penalty phase, the jury had decided beyond a reasonable doubt that, I think, that Wade Lush had lied to them. They did not believe his account when he took... he testified under oath about his alibi, and... and that was offered, of course, to counter the recorded confession. So, it seems to me under, you know, given that scenario, it's very problematic that the defense counsel didn't offer any mitigating evidence from others. Well, I... I think that the decision not to pursue that... that line of inquiry should be looked at based on what counsel knew and what counsel did, and all of what he knew and all of what he did, or excuse me, the majority of what he knew and all of what he did was in the state court record. And what he knew when he decided to pursue this theme of Wade Lush was isolated, he was alone in the world, he was under the domination by... by his co... co-defendant, what he knew is that Wade Lush had been given up at one month old. He had been abandoned by his parents. He never saw his father. He saw his mother a couple times a year. He had one aunt in the United States that he had seen one time, that all of his friends in the United States were dead, that he was a average student that attended class regularly, that he was... And all of this evidence came in through Wade Law? No, it did not. In the guilt phase, who... who testified to these facts out of the Wade Law? Well, it's not that it was presented to the jury, it's... knew when he made the tactical decision. If that's what we're talking about, he made all of that pre-trial, right? He made those decisions pre-trial. And my point is, not that that was unreasonable, my point is that when we get to the penalty phase and the jury has decided that that... that background evidence, which I think is dependent upon Wade Law, that's very problematic because some of it is quite likely to have been considered mitigating by the jury, but the jury had just decided that... decided that Wade Law lied to them under oath. Well... So at that juncture in the trial, it seems to me really incumbent upon the... the defense counsel to do something else to offer some other mitigating evidence. Well, I think the counsel knew that Wade Law had been found to be a liar as to his culpability in the crime. Yes. But I don't think it would be fair to say that they would have considered him to be a liar as to his account in the Soviet Army. And I think what's important is that at that point, counsel had already presented the guilt phase. He had already set up the steps to present what he did present at... at penalty, which was, again, this theme that he was isolated and alone. And had he brought in... He could have easily... I mean, he could have presented evidence that corroborated the maltreatment. And the... the prosecutor, sorry, was able to get up and say... He was a deserter. You're going to, you know, this guy is a terrible guy. He was a deserter. He deserted the Soviet Army. And... and there was nothing that talked about... Well, first of all, he was conscripted into that army. Second of all, he was treated like a slave in that army. And third of all, he was lucky to escape. Well, regardless of how the prosecution described his escape from Estonia... Well, that's an important consideration, counsel, because what you can only describe... You can only argue the evidence that is in the record. And so what did defense counsel have to counter that evidence? Well, counsel had the testimony of the victim's husband. Counsel had the fact that the victim herself helped aid in the... in the development of this article. And defense counsel had the article, which all undercut the idea that... As Judge Christin keeps pointing out, at the guilt phase, they decided they obviously didn't believe Wade Law at the guilt phase. So... And again, to bring in this new, unremarkable mitigation presentation that is now being put forth would have undercut what was presented. And that was that he was alone. To bring in now all these family members to testify on his behalf, which... Oh, you think it would have contradicted the notion that he was alone in the world? Certainly. Certainly. It also... Well, he certainly was alone in the United States, but it omitted the fact that he was there, was accepted into an elite academy in his hometown and... Or in his state, his country, and was a superb marksman, got awards for being a good citizen in that school. I mean, all of this evidence that was available. And then we have the expert saying that that evidence was readily available. And we don't have a Landergan situation here because Wade Law wasn't stopping or interfering with his attorney. And he'd even begun to at first express reluctance for the attorney getting this evidence, but he had not stopped him. And he was changing his mind about going back and getting people. And we have evidence that it could have been done at the time, because it was done for his co-defendant. Well, just if I could make a couple of points in response, not only would it have undercut this idea that he was alone, but it also would have severely undercut the theme that he was under the domination of his co-defendant. The teachers and the classmates would have come and talked about how he had in their view. So these themes that counsel presented, these compelling themes, which did cause the jury to deliberate for a lengthy amount of time, would have been undercut and replaced. I think some of them would have been. I think some of them are a mixed bag. I understand that. You've made that argument in some of your briefing, I think persuasively. I can imagine some of this cutting two ways. Certainly there's the view that he was, some people perhaps could in that way, that he'd overcome a great deal, and was actually very fortunate to make it to this country. So I appreciate that argument. But what about the evidence, which we typically see evidence of when it exists, of a prisoner adjusting very well to prison? I really struggle to see any downside to introducing that evidence. And by the time of trial, there would have been about a two-year track record of that, I think. Well, I don't think there was a downside. I don't think there was a requirement to present that evidence. It certainly could have been presented in mitigation. However, the evidence was simply that he performed well in jail. It was very paltry, especially in light of the fact that, as Your Honor touched on, he squandered the good fortune of being able to escape the Soviet army. But you're going to end up weighing. That's essentially, now you're pivoting to weighing the evidence. But in terms of the prong one aspect of Strickland, whether it was deficient performance to not introduce it, I struggle to see how it would not be. One thing jurors want to know is that this person's not going to kill again. And it seems to me that in the closing argument counsel delivered, he argued almost the same thing. There's a line or two in the closing, and I'm sure you're familiar with it, perhaps more familiar with it than I am, but I can paraphrase it. He said something to the jury to the effect of, who better to teach other inmates about the importance of freedom and the value of remaining crime-free? He made an argument like that. And it seems to me that that really went to this notion that he's going to do well in prison. He has something to offer in prison. But the two-year track record of, I think, really quite exemplary performance was not before the trial court. Well, two points. First, I think it may have offered an insignificant benefit, if any at all. However, and this goes back to the performance prong, counsel's declaration, as the district court acknowledges, is silent as to jail behavior. And this court must take that silence and presume that counsel acted competently when he chose to focus on more compelling themes. Well, now you're confusing me a little bit because now you're peeking at the federal evidentiary hearing, counsel's declaration. I'm not. I'm sorry, go ahead. The declaration that he submitted at the state court level. Different declaration, okay. Well, same declaration. The declaration that counsel submitted is the same declaration throughout. We're miscommunicating, but I know what you mean. Okay. Go ahead. All right. So, the declaration that was submitted, the district court acknowledged that it said nothing as to jail behavior. It didn't talk about Wade Love's behavior or any decisions concerning that behavior. Right. So, because that omission exists, that silence must be taken and counsel must be presumed to have acted competently when he chose to presume, excuse me. It's a presumption. It's not a rebuttable presumption. And I'm trying to figure out what reason could there be, how could it have been strategic to omit that evidence. So, I think we're saying the same thing. I just really struggled to see it. And I think the answer is that because there were other more compelling themes that counsel chose to present. But if we do look at whether he was prejudiced by the failure to present. Before you move to prong two, I'm going to stop you and ask if my colleagues have other prong one questions. Doesn't seem like they do. Go right ahead, prong two. So, if we are talking about prejudice, we not only look at this mitigation evidence that is now being put forth, but we look at the facts of the crime. And this was a heinous crime. Wade Love was an axe murderer. He murdered a little old lady in her home. The violation of trust that occurred was severe. Wade Love, this maternal, this motherly figure who had taken him in, who had provided shelter and love and healthcare and employment, he waited in her home with a hatchet because she wouldn't give him the value of a used car. And he took that hatchet and he bludgeoned her. And he smashed her face in and he broke out her teeth. And then he turned the hatchet around and he plunged it into her head and cut off a flap of scalp and bone. And then after doing that, he showed absolutely no remorse when he fled to Montreal and wrote his co-defendant a letter talking about how he was celebrating by drinking Bavarian beers. So, these horrible circumstances of the crime would not have been outweighed at all by this new mitigation evidence. This is not the kind of evidence that this court or the Supreme Court has recognized makes a difference. This was not abject poverty. This is not sexual abuse. This was extremely benign. This was that he didn't get in trouble while awaiting trial, which should be expected. I know. It's also unique in that he was 20 years old. There is that. That's true. And that's in the briefing as well. All of his declarations say very little about him. If you look at all the family declarations that he provided, the most that they say is that he was quiet and calm. The counsel, aren't we supposed to consider the evidence? This is why I'm not there, by the way. I have this congestion, so excuse me. But aren't we supposed to weigh what could have been presented with what was presented, and he was tortured? There's all this other stuff that didn't come in that the jury didn't consider, and yet they still took less than a day to convict him. They took nine days with two notes saying they couldn't reach a unanimous decision. I mean, even so, even having found all of that, there was a lot of evidence that could have humanized Weylau. I mean, he was tortured in the Soviet army. That must have been some kind of an experience that could warp someone, and even yet, and maybe cause him not to think the serious consequences of all this stuff as a 20-year-old, and yet, once he was imprisoned here, he was getting high positions among the prison population and no problems at all. The question, if that had come in, the question is would the jury have just tipped it slightly toward life because there was no threat that in this structured environment that he was likely to kill again? Well, I'd like to make two points in response. First, I suspect that had they deliberated for a day, we would be here arguing that that showed that he was certainly prejudiced. Are you, now you're speaking about the penalty phase deliberations or the guilt phase? Correct, the penalty phase deliberations. So I don't think the length of time shows anything beyond that counsel presented a compelling penalty phase argument. But he didn't. That's the whole problem. He didn't present any mitigation evidence in the penalty phase. The jury was struggling over something and counsel presented compelling themes to give them pause. Wouldn't it have been nice if there was evidence that supported those themes? There was evidence supporting the themes that he presented. However, I think that anything is possible. And what the question must be and is, is it, can it be said beyond all fair-minded disagreement that it was reasonably probable that this new mitigation defense would have resulted in a different outcome? And the answer is no. Not only, again, would it have conflicted with what was presented, but it was very unremarkable evidence and it was not the evidence typically seen that would get the result that Wade Law is now asking for. Remind me how long they deliberated in the guilt phase, please. I'm sorry. I don't know. I would be guessing. I've got a record site here. It's fine. Thank you. Nine days in the penalty phase and there were two notes sent out. Yeah. Judge Miller? Can I ask you just to sort of go back to where we started with? I mean, do you think that the argument about whether we consider the evidence that was presented in the or do you think you would win either way? I think we win either way on prejudice, certainly. But I think that if we do look at what was presented at the evidentiary hearing, I think we would win on performance as well. And without it, do you? That was going to be, I was going to say, I think we went on performance anyways, but I think that the evidentiary hearing evidence considerably bolsters our argument. Thank you. And for all of those reasons, I would ask that this court reverse the district court's grant to the penalty phase relief. Thank you, counsel. Thank you. Did you have one more? No. Oh, no. Oh, all right. I see I have five minutes left. Is that? We'll reserve it for you. Thank you. Counsel, could you give me just one minute? I want to check one thing before you begin. Pardon me. Marta Van Landingham appearing on behalf of Town and Wade Law. And if your begin with just a quick rebuttal. Hang on one second. Let's just be really clear about, I've asked you both to address, we're going to hear an argument on the PFR today. Are you also planning to argue the rest of the case today? I am absolutely ready. Go right ahead. All right, counsel. I'm sorry. I just didn't, I don't have a day sheet. What is, what's your name again? Marta Van Landingham for Town and Wade Law. Go right ahead. So to begin quickly by addressing some of the points made by the state. First of all, your honor asked how long the deliberations were on the guilt phase, and they lasted four days, four court days. I just verified that. Thank you. I appreciate the confirmation. Yes. I also want to point out that those four court days were immediately preceding the nine days of penalty phase deliberation because the penalty phase presentation only lasted one afternoon, including jury instructions. Right. But what do we make of the fact that the jury, I'll just tell you for the benefit of both counsel, for me, the most compelling fact about the penalty phase is the length of the deliberations. That's a long deliberation. There's also a lengthy deliberation on phase one, and they'd heard his tape recorded confession. They deliberated four days. Correct. What do I make of that? They even asked during guilt phase deliberations to hear that again. So I think what we make of it is that looking at the entirety of our claims and the evidence presented and the complete lack of failure of trial counsel to conduct any investigation and present witnesses for penalty and to do very little for guilt phase shows us that there is no reasonable probability that one juror would not have, absent these constitutional violations, reached a different conclusion, at least on the penalty phase, if not on guilt phase. I think that's what we're to make of it because... You just argued that there was no reasonable probability that a jury... You mean that there was a reasonable probability. Oh, correct. That's all right. Yes. Because a different inference could be drawn. Having heard his tape recorded confession, the jury took four days to convict. So this is a very careful jury, a very deliberative jury, for whatever reason, and we never know exactly why. But it makes it somewhat less surprising to me, then, that they would deliberate as long as they did on the guilt phase, on the penalty phase, they had no mitigation evidence, really, except what had been presented on guilt phase. And they knew that there had been a co-defendant. They obviously had a lot of questions, as did, frankly, the DA before all of this as to whether Mr. Wadelaw was even death-worthy. So I think that's what we see, and we can't really question what those nine days of deliberation were about because of the two jury notes expressly stating that they were deadlocked. And on the second jury note, they revealed... They were polled, and 10 of them said that there was no reasonable probability... They might not have used reasonable probability... No probability that they could reach a unanimous verdict. So I think that shows pretty clear that it would not have taken much to send them back in the other direction to a vote for life. But they didn't have anything, much less a little bit, that could have done so. In terms of other issues raised by the state, I think his presentation really showed not just the paucity of the evidence, but the complete paucity of investigation. He pointed to the statement by trial counsel that he attempted to call the uncle a few times. An attempt to call is not an investigation. The theme of being isolated and of domination, neither of those themes can be reasonable, lacking any investigation. For example, had he investigated, he would have discovered a lot of evidence of domination by Peter Zacharias of Town of Wade Law. There were a number... The California Supreme Court didn't think so. We don't know what they thought. They provided a summary... Oh, you mean in the separate... who could have corroborated, who could have offered opinions to humanize. Opposing counsel argues that that would have been contrary to defense counsel's strategy, his theme, which was that this is a very young person, 20 years old, who was alone in the world. A very young person, 20 years old, who is easily dominated would be, as far as I can see, a much more powerful mitigation strategy. But regardless, any strategy that's not based on a reasonable investigation is not itself... How does any of the evidence from Estonia or any of the evidence from the army, which he escaped from, show that he's easily dominated? There were discussions within the declarations about his being a follower. One of his good active dominating and talked about how basically Talino followed him and everything. So there was evidence that would have supported that, that was never found because there was no investigation. So it wouldn't have undercut that investigation, this theme at all. It would have supported it and made it stronger. If you don't mind, I'd like to touch on the PFR, and then that might bring us back to some of the more general arguments we can make. The state has not met the standard for panel re-hearing under Rule 40. It seems to me that the state is seeking to re-litigate on the happenstance that a member of the former panel has retired. And the PFR is based on a claim of error in a footnote where the court finds a waiver of the state's possible objection to the court's procedure in analyzing the claim. And the state misrepresent that footnote as finding a waiver in the state's objection to the sufficiency of the evidence proffered as to a subclaim. So right there, there's no error. And the state did waive any objection to the procedure because it didn't make it at any point before. Well, you're talking about footnote one. Yes. And it mentions a couple of different aspects of procedure. Is it your contention, or taking them in order, is it your contention that the state has waived any objection to the fact that there was not a de novo review conducted by the district court after it found 2254D was satisfying? Correct. As the footnote noted, the state's objection was only asked to its 2254D analysis, not as to its procedure. So I asked a different question. Oh, that's okay. You've got a lot of things going on today. There's a lot of balls in the air. But I was trying to ask, and maybe I didn't do a very good job, but I'm trying to ask whether your position is that the state waived any objection to the aspect of the trial court's decision that just went, you know, didn't conduct a separate de novo review? Yes. That is our position. And even had the state not waived that objection, that objection would be unavailing. And here's where I'd like to really dive into the PFR. And there are four key issues I'd like to raise, just to quickly road map them for you. The facts underlying the subclaim that the state brought into issue in its PFR have never been disputed by the state. Number two, the competency of the evidence that Wade Law submitted in support of these facts was not challenged at all until this appeal. And two of the four supporting documents to the subclaim of a good adjustment to jail have remained completely unchallenged, even in the PFR and in the appeal. Number three, especially when the facts underlying a claim are undisputed, a court can grant relief with no disciplinary hearing on both D and A. And four, there is no requirement for a formulaic statement that a federal court is reviewing separately the two analytical steps. So to begin with the first point, the district court also found that the facts underlying the subclaim that the state placed at issue have never been disputed. The state has never argued that Town O'Wade Law did not have a record of good behavior in jail. And it has never disputed that trial counsel failed to review the facts on a strategic basis, one that this court, in its opinion, found unavailing. With regard to the competency, it did not challenge the competency of the evidence presented to support the subclaim in either the state or the district court. On appeal before this court, it has challenged only the competency of two of the supporting documents, but never the decision not to charge Wade Law capitally. Or the fourth, which is trial counsel's declaration. The state has said that trial counsel's declaration that was before the state court was silent as to the issue of the good behavior, but that's not actually correct. In that declaration, trial counsel stated, I was aware that there were no disciplinary proceedings in county jail against Wade Law. And then he went on to state, I did not investigate or develop any other mitigating evidence relating to good behavior. So that was at 1 ER 280 and 281. So that evidence of IAC for failure to bring the subclaim has been uncontested, unrebutted, unchallenged. And then with regard to the DA memo, that has not, as far as I can see, been mentioned by the state with regard to this subclaim. Not only did trial counsel fail to present it to the jury as evidence of good jail behavior, which under Skipper is very valuable to show not just peaceable conduct and adjustment to Mr. Wade Law was dangerous and did not mind killing, but it would also have gone to culpability, which in other ways would be highly mitigating of Mr. Wade Law, as this court has previously found that this sort of charging decision memo can be mitigating in Sanders v. Davis. This January 1989 memo concluded, I concur with the previous attorneys who have reviewed this case that the death penalty is the appropriate penalty for defendant Zacharias, but that the defendant, but that the death penalty is not the appropriate penalty for defendant Wade Law. It goes on to lay out the basis for why. Not just the fact that Mr. Zacharias had a fairly violent record within jail. He was found twice with homemade knives and once associated with an unloaded gun. But it also talked about how Zacharias, that there was evidence that Zacharias may have been more dominant and that Wade Law does not evidence the same degree of danger that and sought the death penalty against Wade Law after Zacharias, who'd been scheduled to be tried first, was declared incompetent to be tried. So then the DA changed its charge to death penalty against Wade Law. So that shows, I think, that regardless of the challenge to the other two and that presentation of evidence and support would have been mitigating in any number of ways. And then my third point was that when the facts underlying a claim are undisputed, a court can grant relief without an evidentiary hearing. And the Ninth Circuit opinion that goes into this issue in most detail is James B. Ryan, which talks about how when there is no evidentiary hearing and no basically disputable claims, that that is fine. That the court should and can grant relief under both D and A. Some of the quotes from that are, a general desire to cross-examine an offiant does not suffice to raise a genuine dispute. And basically it concludes that the district court was within its discretion to deny an evidentiary hearing absent controverted facts. And that opinion also lists Supreme Court and Ninth Circuit as the state pointed out, the district court did hold an evidentiary hearing, which is relevant to show here that the state itself did not take the opportunity to dispute the facts or to challenge the evidence. Contrary to what the state says in its PFR, trial counsel was questioned the CDC report in which the CDC official called the jail and was told that Mr. Wade Law had programmed well and had no behavior problems. That was placed before trial counsel during the evidentiary hearing and he was questioned and he admitted that he knew about this there and did not follow up. The state did not cross-examine as to that. The state with regard to Mr. Wade Law's declaration, which laid out all the facts that showed, that demonstrated his good behavior in jail, with regard to that declaration, the state neither subpoenaed him in order to cross-examine him. In fact, it goes further in that Wade Law's counsel attempted to subpoena him at testificandum and the state opposed that motion. So the state never before, during, or after that hearing questioned the competency of any of the evidence supporting that subclaim. So basically, the state has waited until the federal appeal to demand this evidence in a different form. And then finally, the fourth point was, I think it's fairly clear, that there's no requirement under Supreme Court law or any other clearly established federal law for two separate steps in analysis. And Grant v. Hasey is the best support for that, in which the court states, a holding on habeas review that a state error meets the 2254D standard will often simultaneously constitute a holding that the 2254A or 2241 requirement is satisfied as well. So no second inquiry will be necessary. Thus, both the district court and this court correctly stated and applied the law. With regard to the separate claim of the state's presentation, not only of contradictory theories in the trials of both Mr. Wade Law and Mr. Zacharias, it goes beyond that. The state pretty clearly presented false evidence in Mr. Wade Law's trial in order to stretch... Just to be clear, this is your guilt phase due process claim that you're talking about now? It's penalty phase. And the guilt phase one has to do with the confession, the Edwards-Innes claim. Here, basically, the presentation of the contradictory theories we presented as a penalty phase claim. And this court, in its initial opinion, did not reach a finding on that because it had granted relief. Before you leave the penalty phase IAC claim for failure to introduce mitigating evidence, could you go to Strickland Prong 2? The prejudice? Yes. Well, I think this court itself, in its opinion, did a good job of describing what the evidence and mitigation should have been. I didn't ask a good question. I'm asking you to explain to me why you think the California Supreme Court's decision on prejudice was unreasonable. Why would this mitigating evidence have made a difference? I think the major factor here is the length of the jury deliberations. Nine days is... I'm not familiar with too many other cases where the jury deliberates for nine whole days and declares a deadlock twice. I think that shows a very real equipoise and that it could easily have been brought back in the other direction. But weighed against that, balanced against that, is only one afternoon of penalty phase that included jury instructions. I think they deliberated for four days in the penalty phase. No, four days in the guilt phase. I'm misspoken. We just clarified a minute ago. Four days in the guilt phase, and it was the morning of day nine in the penalty phase. So I'm looking at Strickland Prong 2 prejudice, and you've just told me that you think that the strongest evidence there is, indication that there is, that the failure to introduce mitigating evidence might have mattered is that they deliberated a long time. Yes. I think she was saying, just to clarify, at least I understood, oh, what she was saying was that there was only one afternoon of penalty phase... Evidence. Evidence. Penalty phase hearing, just to clarify. I don't know if that's what you were saying. I think that was... You're correct, Judge Royoff. I misunderstood. Thank you, Judge Royoff, for that. Yes, it was a very short presentation. Yes. Okay. But I'm concerned that there was also a very lengthy deliberation after they heard his recorded confession in the guilt phase. That seems to tell me that this was... To the extent we can know what juries are doing behind closed doors, which is always a little bit like reading a crystal ball. This is a very deliberative jury. It was a deliberative jury, but that's the jury's job, to deliberate and to decide, and it clearly did take its duty seriously. So are there any... I'm not aware of any, but maybe... Are you aware of any cases that say that at Strickland Prong 2, we can draw any inference from a very short jury deliberation that the putative error by counsel must not have made a difference because, you know, look, the jury decided really fast? I can point, and I think this is in our briefing, to... In its briefing, the state had cited several California cases, so it's not presidential here, but he cited several California cases that kind of weighed against the length of those cases. Basically, the argument had been made, as you stated, that a short deliberation shows lack of prejudice, and the California courts were finding against that. Okay. So, I mean, I guess, doesn't that undermine your... I mean, because if a long deliberation should cause us to infer that this evidence must have made a difference, it would seem that a short is not an inference that is drawn under Strickland. On that side, why should we draw it here? I am not aware of those cases, but I am aware of a number of cases that do discuss the length of deliberations as showing prejudice within this circuit, and those are within the briefing, and they are very clear. I mean, there are cases that show three days of deliberation show prejudice. There's one, I think, that says two days of deliberation. So, we can look at the length of the deliberation when it helps you, but not when it hurts. Well, I'm certainly not going to argue that. No, but... Well, but I know that... I mean, it's not just the length of deliberation. It's also the fact of two explicitly stated deadlocks, in which 10... At the second one, the later one, 10 of the jurors said there was no unanimous verdict. So, it goes beyond the length. It goes to the substance of the explanation for the length of the deliberations. So, there is more than just the length, but also with regard to prejudice, not only has this court itself laid out what the story should have been, good behavior, lack of violence, abandonment... I'm sorry, lack of violence. I mean, this is the psychological profile that said that he was averse to violence. Yes. And that would have been presented to a jury that had just determined that he hacked a woman to death with an ax? I think, well, there's a big difference between somebody who is violent throughout his life, somebody, for example, like Zacharias, who confessed to the police that he killed somebody else, who had committed all sorts of violence, and somebody like Waidlaw, who's generally a follower, averse to violence, averse to confrontation, and finds himself in a situation with Mr. Zacharias, where there is a singular, unique explosion of violence. Nothing before, and as shown by the good jail behavior evidence, nothing after. I think a juror is going to weigh that picture differently from the picture that was being painted by the DA of Waidlaw as always being violent, always being dangerous. Can I ask you to discuss what we should make of the California Supreme Court's decision, in which it considered the impact of the state's decision to present disparate theories between the two cases? I think we touched on this a minute ago. The California Supreme Court did not decide that that was prejudicial as to Mr. Waidlaw, in part because they thought there was evidence that he was the leader and directed Zacharias in this crime. As you know, I know you're very, very familiar with the record, but I'm distracted by your comments now. Yes. Let me pull up my notes specifically on that, because I want to point out first that in making those findings a fact, the California Supreme Court was usurping the ring and the other case that is very important. I think it was important, and I am absolutely paraphrasing, so correct me, but they were considering that Mr. Waidlaw had agreed that he inflicted the first blow at a minimum, and that he, after she was down, that he directed his co-defendant to stab her, and she was repeatedly stabbed at that point. So I think this is my loose paraphrase, is that their conclusion was that Mr. Waidlaw had been directing the events on the day of the crime. Please explain to me why I have that wrong. I don't remember in his confession his stating he directed Mr. Zacharias to stab, but if you do remember that. I didn't suggest that he confessed to that, that the California Supreme Court reached that conclusion, I think, in its opinion. Well, then that's a fact that's not in evidence, and again, that constitutes a usurpation of the jury's role here. So I think that what they were relying on, this is a long way of getting there, I think what the California Supreme Court was relying on was Mr. Zacharias' confession, which was not admitted at Waidlaw's trial, right? Correct. But the jury would not have known about that, but they would have Mr. Waidlaw's confession. They heard that, the tape-recorded confession. Right, but the DA was taking full advantage of the jury's lack of knowledge of Mr. Zacharias' confession by telling them a fact which the DA knew to be incorrect. Mr. Zacharias had confessed to being the one who used the sharp portion of the hatchet against Ms. Pierisil's head. So he... Right, I'm just struggling to, this is, I'm struggling to understand your response to Judge Miller's question, which is you're stressing that there was evidence that he was non-violent, right? And we're talking about prejudice, strict and pronged too. But his confession includes him taking responsibility for using the sharp end of the axe or hatchet, right? The blunt end of the axe, of the hatchet, that's all he confesses to, Mr. Waidlaw. It's the initial blow, right? The initial blow, one blow, that's all he confessed to. That is... I don't know what I'd say, sudden. It was, there's significant evidence of premeditation, of breaking into the cabin, getting the axe, coming in, lying in wait in the house. Is that an unfair characterization? It can certainly, and trial counsel should have argued it differently. He should have argued that the hatchet could have served to break into the house. And there is a lot of evidence that should have been presented that Mr. Waidlaw felt he was owed the car, the Alfa Romeo, that the Pearsons had promised him in exchange for his work. But there was no evidence that he was owed the jewelry or the credit cards? No, but that he felt, and that they had promised it. I think even Mr. Pearsons agreed that they had told him at one point that they would get him that. Okay, so here's my question, because I'm troubled, very troubled by strict and pronged too, and I'm going to give you every opportunity. What is your strongest strict and pronged too prejudice argument, please? It has to do with domination. It has to do, in addition to, you know, the story of everything he went through, it has to do with the fact that Zacharias could have been shown to have been the dominant personality, the violent personality, not Mr. Waidlaw. None of that was ever shown to the jury, and at least one juror in this very, very balanced jury would have gone the other way pretty clearly if they had not, if they had, you know, not thought that Mr. Waidlaw was the one wielding the sharp end of the hatchet against Ms. Pearsons' head, as the DA repeatedly stated, knowing that was false. Does that help? I appreciate your argument very much, but let me just make sure that I've, Judge Miller, anything further? Oh, I think Judge Wardlaw is trying to, Judge Wardlaw, I think we're, are you muted? I'm muted. So what I was saying is that the very argument that the defense counsel is making today, the state counsel made the same argument today that the sharp edge was used by Mr. Waidlaw, and that was not in fact true, and we got the same argument today that we got, you know, that the trial jurors heard when they were weighing whether Mr. Waidlaw should live or die. So the point being that confession, which the jury heard, indicates, I think, that Mr. Waidlaw confessed to being the initial, striking the initial blow, but you want to underscore that there's this distinction between the sharp edge and the blunt edge, and what he really confessed to was, admitted that it was the first blow, but not that it was the sharp edge. And it's just not, and not, yes, and it's not just I who's underscoring that. More importantly, it was the DA who emphasized it repeatedly. He's the one who kept painting the picture of Mr. Waidlaw using the sharp end to chop off the top of the skull, leaving blah, blah, blah, blah, and he said, even if Mr. Waidlaw confessed only to using the blunt end, don't believe him, because again, he was taking advantage of the image of Mr. Waidlaw as a liar, don't believe him because why would he have, you know, switched out the hatchet, whereas he knew that Mr. Zacharias had explained the knife he was using broke, and so he took the hatchet and used the sharp end against her head. Right, and so the California Supreme Court found that switch, in theory, was not prejudicial as to Mr. Waidlaw. So what's your best response, please? That that was erroneous, unreasonable, and clearly wrong. Judge Waidlaw, I'm not sure if you were trying to ask a question earlier when you were muted, or I want to make sure you get all your questions out. I know, I'm fine, I'm fine, but wasn't that in the, wasn't that a claim in the Okay. And I also want to remind the Court that the California Supreme Court did not make a finding regarding the actual due process violation on that claim, but the fact that they found a due process violation as to Mr. Zacharias kind of shows that they would have found it as to Mr. Waidlaw, too. It was only on prejudice, where based on what must have been a finding of fact again, that should have been put in front of the jury, but never was. I mean, the facts of Mr. Zacharias' confession were put in front of Mr. Zacharias' jury, and they clearly found it compelling because they gave him the death penalty, but that, those facts apparently were not compelling to the California Supreme Court in the same way. So the California Supreme Court took the jury function and found differently than an actual jury had done. Anything further? You're over your time, but we appreciate your argument very much. Thank you, Your Honors. Thank you. And just to be clear, I don't get another rebuttal, right? Right. Okay. Thank you, Your Honors. If I could just clear up three things. First, there were two attacks with the axe, and Waidlaw's confession was as to the first one. And as was demonstrated by the evidence, when the victim entered her house, she was not only bludgeoned, but also struck with the sharp edge. After she had died, she was then dragged to another room where two non-hemorrhagic blows were inflicted. There's evidence that she had suffered trauma to her neck consistent with being strangled. Is there evidence, or was there evidence temporally to indicate whether she was strangled first before the hit by the axe? I'm unsure. The damage to her throat also was due to the blunt force of the blunt side of the hatchet. You think all of the damage to the throat was due to the blunt side of the hatchet? Well, the hatchet, it was testified from the coroner that the hatchet was used to shatter her larynx. That's a different question. Is there no evidence of strangulation? That her neck was grasped? Yes, I believe there was. Okay. I believe there was. All right. So you were saying there's two axe attacks? Correct. And Waidlaw confessed to being the perpetrator of the had been bludgeoned. So as the California Supreme Court found, the attribution of the two non-hemorrhagic blows later, which were perpetrated by the co-defendant, would have been harmless. The other thing I wanted to clear up is the notion that the evidence that is now being put forth could have been harmonized with this idea that he was and this is by both Pork and Roumette, is very clear. And that is that he displayed, Waidlaw, displayed a strong will to succeed and that he had developed a reputation among teachers and coaches for willpower and a desire to fight for justice. So it very well would have conflicted with what defense counsel did present at trial. And then finally, the Declaration of Trial Counsel, it does say at paragraph 4 that he was aware there were no disciplinary proceedings against Waidlaw. But it does not say that he did not conduct any further investigation into jail behavior. In the subsequent, or in the later paragraph, paragraph 5, it states that he didn't conduct any mitigation investigation beyond what was presented at guilt phase. But again, that's not only belied by what came out at the federal evidentiary hearing, but it also is not, as was suggested, specifically referencing jail behavior. We had a who's on first conversation a minute ago about, it was probably my fault, about a defense counsel's declaration. I thought you were referring to some of the, another declaration that was submitted in the federal evidentiary hearing and trying to make a point about that. But I think I was wrong and you were just talking about defense counsel's declaration. Correct. Okay. Correct. I just misunderstood you. Okay. And one thing I also would like to say is that as far as the deliberations are concerned, it can and is argued often that a short deliberation also demonstrates prejudice. Just this week, in another capital case, an advocate argued that very point. And that was in Dennis. So the lengthy deliberations simply show a conscientious jury and the fact that they were struggling over something. What that is, we can only speculate. But what we know is that counsel had presented a compelling argument with specific themes. And the replacement of those themes would have entirely changed the argument. Thank you. No further questions? Judge Wardlaw? No. All right. Thank you. Thank you both for your careful advocacy. We appreciate it very much. We will stand at recess, take this case under advisement. All rise. This court, for this session, stands adjourned.
judges: WARDLAW, CHRISTEN, MILLER